*368 OPINION OF THE COURT
James C. Harberson, Jr., J.
WATERTOWN HOUSING AUTHORITY’S POSITION
When a low-income family otherwise qualifies for public housing, the rent paid for the rental unit is determined by 24 CFR 913.107 (42 USC § 1437a [a]). The Watertown Housing Authority (hereinafter WHA) is allowed to collect the highest amount of rent as determined by the formula.
24 CFR 913.106 (a) defines how annual income is determined when the Watertown Housing Authority calculates the rent due under 24 CFR 913.107. Pertinent to this case is the requirement that a temporarily absent spouse’s income must be considered as part of the total income from all sources including welfare assistance.
This latter income source defined at 24 CFR 913.106 (b) (6) includes
"(i) The amount of the allowance or grant exclusive of the amount specifically designated for shelter or utilities, plus
"(ii) The maximum amount that the Welfare Assistance agency could in fact allow the Family for shelter and utilities.”
The McCormick family welfare rent allowance calculated by the Jefferson County Department of social services is $147 per month when Mr. McCormick is a part of the family unit and is unemployed or absent. The amount is determined by the size of the rental unit. If this family unit acquired additional income from any source, they may still qualify for some welfare assistance. There would come a point where Social Services may withdraw the shelter allowance if this happens.
The WHA is allowed to review such a change in the financial resources of the family as provided for in 24 CFR 913.107 and 24 CFR 913.106 (a), (b).
In the case where a family has little or no income, the formula under 24 CFR 913.107 based on 24 CFR 913.106 (a), (b) will leave the highest amount due the WHA, the welfare housing allowance the Social Services Department has agreed to pay the WHA for the space being rented. As the family income improves and a higher amount can be realized under 24 CFR 913.107 (a) (1) (30% of adjusted gross income) or (2) (10% of the family’s monthly income), the WHA is entitled to that higher amount even if it exceeds the amount allowed for *369 the space by the Social Services Department housing allowance.
In the case where the annual agreement needs an interim rent adjustment under 24 CFR 913.109 (b), paragraph 5 a of the lease, the WHA is required upon notification of an increase in the tenant’s financial resources or a diminution of them to investigate so an upward or downward adjustment of the rent can be made.
Paragraph 5 a.2 of the lease requires the tenant to notify the WHA within 10 days if the family unit commences to receive welfare assistance or welfare assistance is terminated. Paragraph 5 a.l merely allows the tenant the right to show a change in circumstances that would justify a rent reduction without a time limit.
In the case covered by paragraph 5 a.l of the lease the lack of time limit of 10 days is based on the assumption the tenant would be in the best position as to when the family income change or other circumstances leading to a hardship situation has affected the ability to pay the current level of rent; whereas, in paragraph 5 a.2 the decision of a welfare agency to suspend welfare or allow it is forced on the family and the WHA needs the information to make an immediate review for rent adjustment.
Paragraph 9 of the lease outlines the procedure used when rent reviews are initiated by the tenant or the WHA. Notice to the WHA must be in writing to an employee or the office of WHA. (Form WHA-F-78 "Notice of Rent Adjustment.”) F-38 is used by the tenant to report income changes and/or going onto or leaving welfare. F-38 is the notice of the amount of any readjustment in the rent and the date it goes into effect.
24 CFR 960.209 (b) says "The family must comply with provisions in its lease regarding interim reporting of changes in income. If the PHA receives information concerning a change in the Family’s income or other circumstances between regularly scheduled reexamination, the PHA must consult with the Family and make any adjustments determined to be appropriate. Any change in the Family’s income or other circumstances that result in adjustment in Total Tenant Payment or Tenant Rent must be verified.”
Once this determination has been completed and verified, the WHA must recalculate the rent to determine the highest amount it can charge per 24 CFR 913.107 and adjust the rent accordingly.
*370 respondent’s position
The counsel for the respondents does not contest the structure of these procedures, but they decry the WHA actions in this case. The WHA has refused to conduct an interim rent adjustment review because the tenant did not notify them initially in writing for a request for review as provided for in the lease; and, once such a request was made, the WHA has rejected the request. The WHA as a result, has expected a higher rent payment than has been made by the Social Services Department and has sued for the arrears in the proceeding and for a warrant of eviction for nonpayment of rent. The respondents claim that any amount exceeding the welfare allowance for shelter is illegal because using the 24 CFR 913.107 criteria, the highest amount could only be the welfare payment. A review of the law and facts is instructive.
LAW
Public Law 93-383 was passed by Congress to consolidate provisions of bills involving housing and the "low-rent public housing program (which) goes back to the United States Housing Act of 1937 which provided the authority for the low-rent public housing program.” (Senate Report No. 93-693, 93rd Cong, 2d Sess Introduction, reprinted in 1974 US Code Cong & Admin News 4273.)
In the declaration of policy, the Congress recognized the importance of keeping the stock of affordable housing for the low-income citizens available by helping pay the fair rental value. It was noted the change in name from "low-rent housing” to "low-income housing” was made to signify the concept that the government was propounding a policy of mixed incomes in a project where those with the lowest income could afford to pay their share of the rent with Federal assistance.
As part of this plan the Omnibus Budget Reconciliation Act of 1981 (OBRA) (Pub L 97-35, 95 Stat 357 [codified at 42 USC §§ 1437-1477j]) required a public housing authority to set rents (see, 42 USC § 1437a [a]). In 1974 "Congress amended the Brooke Amendment to include the welfare rent provision, Pub.L.No. 93-383, Sec. 201(a), 88 Stat. 654 (1974), now codified at 42 U.S.C. Sec. 1437 o(a)(3)”; and this was done "to 'encourage’ the negotiation of rents between housing and welfare agencies.” (Howard v Pierce, 738 F2d 722, 729.)
42 USC § 1437a (a) (1) provides that the total tenant payment shall be the highest of (1) 30% of monthly adjusted *371 income, (2) 10% of monthly income or (3) the monthly portion of welfare payments "specifically designated” by the agency to meet housing costs. This last provision is the 1974 amendment, heretofore referred to, designed to "encourage” negotiation of rents between housing and welfare.
It is clear, then, that nothing in the legislation or Code shows that Congress intended to bind a local public housing authority to accept what a local welfare agency determined to be that part of a grant for housing costs as the rent to be charged, if a higher amount was available under paragraph (1) or (2) of section 1437a (a).
In Beckham v New York City Hous. Auth. (755 F2d 1074 [1985]) the court reviewed the obligations of the public housing authority and the tenant as they relate to the purpose of the legislation. In Beckham, and in this case, the housing authority, due to incomplete information caused by tenant failure to supply credible information, established a rent with the scheme of section 1437a. The method was challenged by the tenants but upheld by the appellate court.
The Beckham court noted that the OBRA of 1981 required a specific recertification procedure, saying "it is absolutely necessary for the efficient management of the housing program and to carry out congressional objectives as stated in OBRA’s legislative history.” (Beckham v New York City Hous. Auth., supra, at 1079.)
The court went on to point out that the "policy is a reasonable means of complying with congressional intent that 'limited housing assistance funds’ continue to be focused 'on those who need the taxpayer’s help the most.’ ” (Beckham v New York City Hous. Auth., supra, at 1079.)
It was emphasized by Beckham (supra, at 1078) that "it is the policy of the United States 'to vest in local public housing agencies the maximum amount of responsibility in the administration of their housing programs.’ ” The legislative history of OBRA demonstrates that Congress was very much concerned with greater efficiency and with minimizing outlays for housing programs by requesting tenants to pay a higher proportion of their income for rent and making " 'numerous changes to increase the efficiency of the subsidized housing programs.’ ” (Beckham v New York City Hous. Auth., supra, at 1078.)
When the housing authority was unable to get compliance from certain tenants, an alternate plan was selected which *372 was felt to be a reasonable means to carry out the admonition of Congress that a proper share of the costs be paid by each tenant. The Beckham court confirmed the highest rent due under 42 USC § 1437a could be sought noting "[t]he district court relied primarily on the provisions of 42 U.S.C. § 1437a which provide specifically that a family shall pay as rent the highest of the amounts specified therein.” (Beckham v New York City Hous. Auth., supra, at 1079.)
The court concluded that the housing authority’s method was "consistent with the relevant policy considerations implicated [by] the OBRA legislation, the continuing need to make low cost subsidized housing available for only those eligible for it, and the assurance of rentals equal to 30 percent of the household income.” (Beckham v New York City Hous. Auth., supra, at 1080.)
The respondents allege the hearing process and procedures to be followed are controlled by Federal law at 24 CFR 966.4. The United States Department of Housing and Urban Development in a letter to Governor Mario Cuomo of New York specifically approved RPAPL article 7 for removal proceedings as required by 24 CFR 966.53 (c) and 966.51 (a). This issue is now made moot by this very proceeding brought under RPAPL article 7.
DISCUSSION
On April 18, 1988, Nancy and Patrick McCormick signed a lease with the WHA for a rental unit at $134 per month. On April 20, 1988, a WHA-F-78 form signed by Nate Carbone of the WHA notified the McCormicks that the rent would be increased on June 1, 1988 to $238 because Mr. McCormick secured employment. The notice had a note at the bottom saying "please bring in salary and verification.” On April 18, 1988 the McCormicks had notified WHA on a WHA-F-38 form they were coming off welfare on April 15, 1988 and that Mr. McCormick was moving in as of April 18, 1988.
The tenant gave notice, the WHA reviewed the new financial information and the appropriate rent of $238 was charged as of June 1, 1988.
On July 21, 1988 Nancy McCormick filed a WHA-F-38 interim rent adjustment notice with WHA requesting an interim review of the rent because on July 21, 1988, she told the WHA office her husband had left her on July 7, 1988. She *373 also said her current and former spouses were to have either paid the rent or given her support.
There was a note on this form "Take husband off lease— have Mrs. McCormick sign new lease when verified.” Then, on September 13, 1988 Nancy McCormick filed another WHA-F-38 advising WHA that on August 29, 1988 Mr. McCormick was back in the household as discussed with WHA employee Mr. Pike and application had been made for social services on September 22, 1988. At this point no rent had been paid in any amount for several months by the McCormicks.
A summary proceeding was commenced in this court in August of 1988 which resulted in the Department of Social Services making the past rent payments on an emergency basis so that as of September 1988, all rent due was paid at the rate of $238 which had been set after an earlier review on April 20, 1988.
The rent for September and October 1988 was paid by the Social Services Department at $238 per month to prevent eviction. The April 20, 1988 determination was still the basis for the rental unit payment based on an annual income of $11,440 projected at that time. There does not appear to have been any formal effort made by the tenant to refute this projected figure and the issue did not become acute because welfare paid the $238, not based on the earlier value of the unit of $147 (paid for May 1988 before the welfare case was closed), but instead on the WHA calculation on April 20, 1988.
It is interesting to note that on September 7, 1988, the Social Services Department in a letter to the WHA stated that all future shelter costs for the McCormicks were "the tenants’ responsibility” and then to note they continued payment by the same agency for September and October rent. The September 13, 1988 WHA-F-38 form did not indicate the husband was not employed but only that he had returned to the household and welfare assistance had been sought.
On November 1, 1988, the Social Services Department reduced the rental payment to the $147 rate and the WHA continued to require $238. The welfare rate was based on Mr. McCormick’s absence, (even if he were working) or his presence in the unit and not working. The McCormick welfare case that had been closed on April 15, 1988 was reopened by that Department on November 1, 1988.
On December 12, 1988 Mrs. McCormick filed a WHA-F-38 showing that Mr. Pike of WHA had been advised to contact *374 the Department of Social Services saying that Mr. McCormick did not live there any longer. She also indicated she was to commence to receive support from him. In the respondent’s affidavit of June 26, 1989, they indicated that Mr. McCormick had separated from Mrs. McCormick, moved out of the premises and that he did not move back in until January 1989 because he was no longer employed. He was placed back on Mrs. McCormick’s public assistance case.
On May 15, 1989 a WHA-F-38 form was filed saying Mr. McCormick had returned to work on May 15, 1989 and was coming off social services on that date. On May 31, 1989 a WHA-F-38 form was given to the McCormicks showing a new rent of $264 effective July 1, 1989. On May 15, 1989, the Department of Social Services wrote WHA advising them the McCormicks’ public assistance case was closed on May 15, 1989.
DECISION
This case has highlighted the varying obligations of the landlord and tenant in low-income housing. This disputed period runs from November 1,1988 through July 1,1989.
The record in this case shows that from April 18, 1989, when an annual income projection was prepared based on Mr. McCormick’s income, until May 15, 1989, no income review was done. The rent due based on the April 18, 1989 review projected over one year was $238 per month. This could be changed based on paragraph 5 a.l of the lease once the change in income (up or down) had been verified. The WHA declined to accept less than the $238 from November 1, 1988 when the Department of Social Services reduced rent allowances to $147 after review by that Department which excluded any income Mr. McCormick had been earning because the Department of Social Services concluded he was not living in the family unit.
WHA advised the Department of Social Services that Mr. McCormick had not left but was only temporarily absent (see, affidavits of Peter Pike and Joseph LaClair dated June 29, 1989 and June 30, 1989). In these affidavits Pike and LaClair stated they knew Mr. McCormick, his vehicle, and where he lived in the housing complex. They both said they saw him on a regular basis from April of 1988 until June of 1989 and they saw his vehicle parked there overnight.
Mr. Pike alleges that when he asked Mrs. McCormick, when *375 she claimed her husband had left, where he lived and other details to verify that he was gone, she never provided them to him. Mr. Pike said he saw Mr. McCormick on the premises on many occasions when he was asking for the information from Mrs. McCormick.
The Beckham case (755 F2d, supra, at 1079) points out that the WHA has a duty to fully investigate the income sources of the low-income tenant to be certain that the fair amount is being charged within the Federal regulations to ensure that those " 'who need the taxpayer’s help the most’ ” are getting it. In Beckham the housing authority was unable to get the basic cooperation needed to determine if the family being investigated qualified for low-income help or at what level of assistance they needed it.
"[E]ach tenant household must cooperate with the Authority and promptly provide, as required, the necessary information regarding the amount and source of family income. * * *
"The Statute does not provide a method of calculating the rent to be paid by tenants who fail timely to recertify their income because Congress apparently never contemplated the tenant beneficiaries of federal largesse would not comply with the essential and reasonable requirement of annual recertification.” (Beckham v New York City Hous. Auth., supra, at 1079.)
The court finds in this case like in Beckham (supra) the WHA adopted a reasonable approach to the fluctuating circumstances of the McCormick facts. From April through September 1988, Mrs. McCormick would complete a WHA-F-38 advising her husband was at home working, he had left without paying rent and that he returned.
When the McCormicks sought to have the rent reduced from September 1988 through January 1989 and Mr. Pike attempted to verify Mr. McCormick’s whereabouts, he was never given a reliable answer. The respondents in this affidavit allege that from September 1988 until January 1989 Mr. McCormick was absent from the household.
At paragraph 9 of the McCormick’s affidavit the McCormicks state "Mr. McCormick returned to the household in January 1989 and was added to Mrs. McCormick’s public assistance case, as he was no longer employed.”
For this reason, notwithstanding the fact Mr. McCormick was employed, the respondents claim the rate of rent should be based on the family unit without Mr. McCormick (which *376 equals the $147 rate). They refute the WHA claim that there was no evidence of Mr. McCormick making less than the annual amount estimated in April 1988 when the $238 rate was set and that he was only "temporarily absent” so his income would still be factored in any interim review of the family financial resources. It is their word against the WHA as to whether Mr. McCormick was actually there during the September to January period as outlined in the affidavits already mentioned.
The McCormicks claim because the Department of Social Services hearing resulted in a determination that McCormick was not part of the household, resulting in a drop in the rental allowance to $147 on November 1, 1988, that this precludes the WHA from charging more than this welfare payment for the unit.
The court finds the WHA has the right (and obligation under Beckham v New York City Hous. Auth., supra) to make an independent decision. The determination of the Department of Social Services could have been accepted by WHA but when they have evidence Mr. McCormick was in the home, then the WHA is under no obligation to change the original determination of family income made in April 1988 on which the $238 monthly rent was based until the McCormicks come forward with the information Mr. Pike had requested.
The issue of whether the spouse (Mr. McCormick) was temporarily absent (24 CFR 913.107) involves a factual and legal determination. The McCormicks urge the court to find the alleged absence from September through January as a period of time exceeding what a period of "temporary absence” is meant to cover. One would anticipate that a temporary absence means one in which it would be reasonably anticipated at the beginning the person would be returning. If the person leaving had no intention of returning then one might fairly assume any subsequent reappearance was unplanned. If the person leaving did plan to return at some point in the future then the length of time expected before the return could be pertinent to determine whether the absence was temporary or of long duration.
There does not appear to be any case law on this point to define what "temporary absence” means. The story of Enoch Arden and current Domestic Relations Law § 220 that presumes a missing person is dead after five years and the one-year waiting time for the abandonment of a spouse to be *377 declared, provide some parameters. The court finds that a reasonable application of the phrase "temporarily absent” in general would be a continuous period of one year. This would address the question of whether the spouse had left due to domestic problems without the intention of returning, giving the abandoned spouse the grounds to divorce the absent spouse. The WHA could be reasonably assured that the absent working spouse’s income was not a family resource after such a waiting period.
The factual question of whether a working spouse was really absent for any period of time must be reviewed on a case-by-case basis. In this case while the McCormicks state otherwise, the court finds on the credible evidence that Mr. McCormick was not absent during the September to January period. In addition, and as a separate finding, the court rules that three months is a temporary absence as a matter of law under 24 CFR 913.107
From January 1989 Mr. McCormick was a member of the household. The McCormick affidavit states he was not working and social services continued to pay $147 per month after he was added in January to Mrs. McCormick’s case, but WHA did not conduct any further inquiry about the family resources because the McCormicks had not filled a WHA-F-38 form showing a change in circumstances.
In fact, the first time such a form was filed was May 15, 1989 when the family left social services and Mr. McCormick returned to work. At no time did the McCormicks advise the WHA that Mr. McCormick had returned to the household and had no job as of January 1989. It was not until April 20, 1989, that the Department of Social Services wrote WHA increasing the monthly allowance to $161 from $147 and subsequently wrote on May 15, 1989 advising that public assistance had been terminated on May 15, 1989.
The respondents contend that the WHA had constructive notice of the family’s financial circumstances because of the welfare payments. But, as determined earlier the WHA was only bound by what its own inquiry showed before changing the April 1988 family resources determination. At no time did the McCormicks go to WHA after January 1989 and advise WHA that McCormick was not working. The WHA had the right to assume then, that there had been no change in the family income resources.
Again, WHA was still receiving $147 per month since *378 November 1, 1989 from the Department of Social Services and their validation efforts to gather data and facts to make a review if the rent had been thwarted by Mrs. McCormick.
After January 1, 1989, the WHA had no reason to change the rent any more than it had before that date. They took reasonable steps to determine the rent due and the lack of cooperation and/or nonreporting by the McCormicks which interfered with the investigation. The court finds under the Beckham rationale that the WHA was entitled to receive the $238 determined by the calculations made in April 1988 for the period from June 1, 1988 until July 1, 1989.
The petitioner is directed to submit a judgment including appropriate costs and disbursements as well as a warrant of eviction to be signed 30 days from the date of this decision absent good cause shown to delay such eviction.